IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 24, 2012

**STATE OF TENNESSEE v. KRISTIN M. MYERS**

**Appeal from the Criminal Court for Loudon County**
**No. 2010-CR-60    E. Eugene Eblen, Judge**

**No. E2012-00494-CCA-R3-CD-FILED-MARCH 18, 2013**

The Defendant, Kristin M. Myers, was convicted by a Loudon County jury of first degree premeditated murder and received a sentence of life imprisonment. On appeal, the Defendant claims that the trial court erred in denying her motion to suppress her statements made to authorities because she did not execute a knowing, voluntary wavier of her <u>Miranda</u> rights. The Defendant also contends that the evidence adduced at trial is insufficient to support her conviction. After reviewing the record, we conclude that the trial court properly denied the Defendant's motion to suppress her statements and that the evidence produced at trial is sufficient to support the Defendant's conviction. Accordingly, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and THOMAS T. WOODALL, J., joined.

Lindsey B. Lander, Lenior City, Tennessee, for the appellant, Kristin M. Myers.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; Russell Johnson, District Attorney General; and Frank A. Harvey, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
<u>FACTUAL BACKGROUND</u>

This case concerns the December 22, 2009 shooting death of the Defendant's husband, Larry Myers ("the victim"). A Loudon County grand jury indicted the Defendant for the first degree premeditated murder of the victim.

The evidence presented at trial revealed the following facts. Around 7:30 a.m. on December 23, 2009, a neighbor was on her way to work when she drove past the Defendant's and the victim's house and saw the victim's body lying in the front yard. She stopped and phoned police. The victim was dead from a gunshot wound to the back.

Law enforcement began an investigation into the victim's death. Detective Mike Newman phoned the Defendant and left a voicemail message. About an hour later, the Defendant returned his call and advised him of her location. Officers Jeff Vittatoe and Brendan Deboer proceeded to the Defendant's motel room at the Econo Lodge in Lenoir City. They parked outside the Defendant's room, and the Defendant exited and identified herself. After identifying himself and Officer Deboer as law enforcement officers, Officer Vittatoe, who was in uniform, asked the Defendant if they could come inside her room and speak with her. The Defendant agreed, and they went inside the room and sat down. Officer Vittatoe described the encounter as "easy."

Two additional officers arrived on the scene and waited outside the door. Officer Vittatoe observed the Defendant and concluded that she did not appear intoxicated or under the influence of any drugs. According to Officer Vittatoe, the Defendant was oriented to time and place. Although the Defendant was not under arrest at that time, Officer Vittatoe gave the Defendant her Miranda warnings. After the initial verbal interview was completed, Officer Vittatoe asked the Defendant if she would give a written statement. She signed a written waiver of rights form prior to giving the written statement. According to Officer Vittatoe, during both the verbal and written explanations, the Defendant indicated that she understood her Miranda rights and stated that she was willing to speak with the officers. Officer Vittatoe described the Defendant's mood as "very calm" and she "wasn't nervous"; she was neither tearful, angry, nor "edgy."

The Defendant wrote a lengthy hand-written statement, which took her about one hour to complete. In the statement, she first described her history with the victim, how they met, and the details of their tumultuous, and sometimes violent, relationship. Regarding the events on the day of the shooting, she provided as follows:

On December 22nd, '09, we were off from work. He hadn't been feeling good for several days. We got up about 9 a.m. but he went back to bed shortly after that and slept until about 1:30 or 2 p.m. When he got up, he said that he wanted to go out somewhere and eat. So we got ready and went to Calhoun's at Turkey Creek. We had a few beers and started to argue a little and then he started getting loud so the waitress told him he, well we, were over the limit. I gave her a wink as a thank you. We ate and left. On the way home he got madder and madder about her "cutting him off." So I tried changing the

subject and started telling him, what I thought, was silly and funny thing that had happened to me. I don't think he was really listening to me though because he, all the sudden, asked me about what my ex used to do. So I started telling him. I thought he would pass out before we got home. He got really quiet so I thought he was asleep. As soon as we pulled into the driveway he spoke up and startled me. We laughed about that and went in the house. We changed clothes and started to go to bed when he mentioned someone[']s name that he kn[e]w that I didn't like and started talking about her. So I got mad. Then he told me not to worry, that "You've still got better p---y than ____." So I got up [making] him turn me loose. I started yelling, he started yelling and I left. This was approximately 8:30 p.m. I drove around for a little while. He was texting me. I was texting him. He said that he had called the law and that he was packing his stuff, that he was leaving. So after about 15 to 20 minutes I pulled back into the driveway and went in and sat down. He started again so I picked up my stuff and headed toward the door. I got to my truck and realized I didn't have a lighter so I went back in to get [one]. He was carr[y]ing trash bags full of his clothes into the kitchen and started yelling at me again as he went back to get more clothes. So I heade[d] back to my truck to leave. As I got in, I saw him coming down the steps so I slammed the door and locked it. He rared [sic] back with his fist like he was going to try to break the window. So I rolled the window down about [three to four] inches and told him he better not bust my window. He started to reach in the window. I had my gun in the console, so I was leaning over to get away from him, I opened the console and got the gun out and reached, well, kind of, stuck it out the window and he turned away and I pulled the trigger. I saw him kneel down as I pulled out of the driveway.

She then detailed where she went after the shooting, ending at the Econo Lodge in Lenoir City. The Defendant's initials appeared on each page of the statement. She also consented to a search of her motel room. No weapon was found therein, and the only evidence collected from her motel room was her cellular telephone. The officers also impounded the Defendant's vehicle.

Officer Vittatoe was asked some questions on cross-examination about the circumstances surrounding the Defendant's statement. Officer Vittatoe confirmed that he never felt threatened by the Defendant and that she was not placed in handcuffs during the interview at the motel. Initially, Officer Vittatoe informed the Defendant that he had been to her residence and wanted to ask "her a few questions to try to clarify some things." According to Officer Vittatoe, he did not tell the Defendant that her husband was dead "until after she had completed her statement[.]" He recalled informing her of the victim's demise

while at the Econo Lodge. He also agreed that his notes from that day provided, "[H]e never disclosed that [the victim] was deceased or even injured during the entire interview and you noticed that she didn't ask." He did not deny that he did not tell the Defendant of her husband's death during the interview. On re-direct examination, Officer Vittatoe, referring to his notes, agreed that the Defendant initially denied shooting the victim, and it was only after he told her he thought she was lying, that she confessed to firing at the victim.

Following the interview at the motel, the Defendant agreed to accompany Officer Vittatoe to the Loudon County Police Department, where she was further questioned by Det. Newman. At the outset of the interview, Det. Newman reviewed the statement that the Defendant had written for Officer Vittatoe. Det. Newman then asked some additional questions of the Defendant. The Defendant admitted that she had fired at the victim sometime between 8:30 and 9:00 p.m. the prior evening. When asked why she did not call the police, she stated that she was unsure if the victim was actually injured and believed, based upon the victim's text message, that the police were already on their way. The Defendant further admitted that she threw the gun off a bridge after firing at the victim and agreed to take officers to that location to look for the weapon. Also towards the end of the interview, Det. Newman informed the Defendant that the victim was deceased; he agreed that this appeared to be the first time the Defendant had heard that information. A recording of that interview was played for the jury.

Det. Newman also participated in the investigation of the Defendant's and the victim's residence. Det. Newman observed the body and noticed that "the dirt had been disturbed in front" of the victim's hands and that his hands were dirty. Det. Newman conducted a search of the residence and collected a copy of a Calhoun's receipt, dated December 22, 2009, and reflecting that the Defendant and the victim consumed sixteen "Mountain Light" beers that evening. The victim's cellular telephone was also retrieved during the search. A gun was never recovered in this case.

Det. Newman testified that he reviewed the text messages on the victim's cellular telephone. The evening of the shooting, the following exchange took place between the victim and the Defendant:

> The victim: 8:37 p.m., this is my lasr [sic] text phone is on desk it's yours
> The Defendant: F--k u go to hell or Tina it don't matter to me
> The victim: U have 5 minutes . . . of you not h
> The Defendant: U been to Tina so go to hell
> The Defendant: You'll so what.
> The Defendant: F--k someone else

The victim:  I have 5 minutes . . . or I'm gone it is 8:40 you have until 8:45. game on Tick Tick

The Defendant: . . . leave.

The Defendant:  WHAT!!!

The victim:  I'm not f--king with u . . , tick

The victim:  3 minutes

The Defendant:  If u don't give a f--k you'd already be gone

The Defendant:  So go run to your little whore

The victim:  If I wanted somebody else I would have been gone . . . 2 minutes

The victim:  Tick

The Defendant:  See how long she keeps your drunk a-s around

The Defendant:  Why do you threaten me then

The Defendant:  Cause you can.

The Defendant:  That's bulls--t.

The victim:  Lol . . . u don't understand . . . I don't need some b---h . . . f--k them and leave them

The victim:  P---y is p---y . . . good or bad

The victim:  times up

The Defendant:  and guess what I can see you from where I am

The victim:  Lol

The Defendant:  see ya, mfer

The Defendant:  Ever heard of a drive by?

The Defendant:  I just wish I had a sniper rifle

The Defendant:  Yeah as long as you get your rocks off

The Defendant:  Well guess what

The victim:  Times up

The victim:  I called the law

The Defendant: Yea! So!

The Defendant:  You haven't gone anywhere.

The victim: Um packing

The Defendant:  Yea right

The Defendant:  What!?!  Your not gone yet?!?

The Defendant:  Yea boy!  You really look like your leaving

The victim:  You will see

The victim:  Look

The Defendant:  Bye.  Tina F--ker.

The Defendant:  Wanda licker

The victim:  I'm packinj [sic] . . . my trunk is full go back to Jason

The Defendant:  I knew that losing weight wouldn't be good enough for you

A photograph of the victim's trunk, partially open, was admitted into evidence.

According to the medical examiner, the victim's cause of death was "an undetermined range, perforating gunshot wound of the chest." The medical examiner also stated that the victim did not die right away from his wound; he bled to death, lingering for approximately twenty minutes after he was shot. The medical examiner opined that, if the victim had received medical treatment during that twenty-minute period, he likely could have survived. Although alcohol was present in the victim's blood, the medical examiner, based on the difference in victim's "blood alcohol and vitreous alcohol levels[,]" believed that the victim "was on the way down the curve at" the time of the shooting, meaning that he had stopped drinking prior to the shooting.

The Defendant called two witnesses in her defense. Another neighbor of the Defendant and the victim testified about multiple arguments between the Defendant and the victim, when the Defendant would come over to her house to avoid the victim. On one occasion, the victim showed up at the neighbor's residence and pounded on the front door, wanting the Defendant to come outside, but the Defendant refused. The neighbor also stated that she frequently saw the victim carrying cases of beer into his residence.

The Defendant also presented the waitress who served them at Calhoun's on the evening of December 22, 2009. The waitress testified about the Defendant's and the victim's demeanor that evening, as well as their demeanor on two prior occasions they visited the restaurant. According to the waitress, the Defendant usually did most of the talking during their visits. On one of the prior visits, the two got into a fairly "heated" argument. On the December 22, 2009 visit, after they consumed sixteen pints of beer, she had to "cut them off" due to their behavior. She believed that the victim consumed the majority of the beers that evening.

Based upon the foregoing, the jury found the Defendant guilty as charged, and the trial court sentenced the Defendant to life imprisonment. This appeal followed.

ANALYSIS

On appeal, the Defendant challenges (1) the denial of her motion to suppress her statements made to authorities because she did not execute a knowing, voluntary waiver of her Miranda rights, and (2) the sufficiency of the evidence supporting her conviction. We address each in turn.

*I. Motion to Suppress*

The Defendant contends that the trial court erred in denying her motion to suppress her statements that, she claims, authorities elicited without a voluntary, knowing, and understanding waiver of her Miranda rights. She asserts that, because the officers did not inform her of the scope of their investigation and that her husband was in fact deceased before questioning her, she did not fully understand all of the concepts when waiving her Miranda rights. The State contends that the record supports the trial court's denial of the Defendant's motion to suppress.

On appellate review of suppression issues, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact. State v. Meeks, 262 S.W.3d 710, 722 (Tenn.2008). Both proof presented at the suppression hearing and proof presented at trial may be considered by an appellate court in deciding the propriety of the trial court's ruling on a motion to suppress. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998); State v. Perry, 13 S.W.3d 724, 737 (Tenn. Crim. App. 1999). However, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23.

When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." Id. However, "when the trial court does not set forth its findings of fact upon the record of the proceedings, the appellate court must decide where the preponderance of the evidence lies." State v. Bobby Killion, No. E2008-01350-CCA-R3-CD, 2009 WL 1748959, at *13 (Tenn. Crim. App. June 22, 2009), perm. app. denied, (Tenn. Oct. 26, 2009) (citing Fields v. State, 40 S.W.3d 450, 457 n.5 (Tenn. 2001)). Additionally, a trial court's conclusions of law along with its application of the law to the facts are reviewed de novo without any presumption of correctness. Meeks, 262 S.W.3d at 722.

Here, the trial court denied the Defendant's motion, making only the following brief statements at the suppression hearing: "All right, she was Mirandized."; "All right, I'll have to overrule your motion."; and "There's a statement in the motion that the [D]efendant was intoxicated but there's no proof in the record that she was or that even in intoxication that she [did] not understand what her waiver was." In response to the Defendant's motion for new trial, the trial court ruled, "The [c]ourt finds that the [D]efendant was not arrested absent

probable cause and that the statements made by her were made voluntarily, knowingly, and without violation of any of her constitutional protections[.]"

"The Fifth Amendment to the United States Constitution provides in part that 'no person . . . shall be compelled in any criminal case to be a witness against himself.'" State v. Thacker, 164 S.W.3d 208, 248 (Tenn. 2005) (quoting U.S. Const. amend. V). "Similarly, Article I, section 9 of the Tennessee Constitution states that 'in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself.'" Id. (quoting Tenn. Const. art. I, § 9). Notwithstanding, an accused may waive his right against self-incrimination. Id. (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). The accused's waiver of his right against self-incrimination under Miranda must be made intelligently, knowingly, and voluntarily to be held constitutional. Id. (citing Miranda, 384 U.S. at 444).

> The United States Supreme Court has interpreted the Fifth Amendment in part to require that an incriminating statement or confession be freely and voluntarily given in order to be admissible. This even applies to statements obtained after the proper Miranda warnings have been issued. Statements and confessions not made as a result of custodial interrogations must also be voluntary to be admissible. It must not be extracted by "any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." Moreover, due process requires that confessions tendered in response to either physical or psychological coercion be suppressed. This has evolved into the "totality of circumstances" test to determine whether a confession is voluntary.

Id. (internal citations omitted). Thus, to determine whether an accused's statements were voluntary, the appellate courts review the totality of the circumstances surrounding the waiver of the right against self-incrimination. Id. at 249 (citing State v. Stephenson, 878 S.W.2d 530, 545 (Tenn. 1994)).

We conclude that the evidence presented at trial supports a conclusion that, under the totality of these circumstances surrounding the waiver, the Defendant voluntarily, knowingly and understandingly waived her Miranda rights. Det. Newman testified that, after obtaining the Defendant's phone number on the morning of December 23, 2009, he called her and left her a voicemail message. According to Det. Newman, the Defendant returned his call about an hour later and advised him that she was at the Econo Lodge in Lenoir City. Officers proceeded to her motel room, and she met them out front of her room. Officer Vittatoe identified himself and Officer Deboer as law enforcement and asked the Defendant if she would speak with them, to which she agreed. They went inside her room and sat down. Officer Vittatoe described the encounter as "easy" and said that the Defendant's mood was

"very calm." Officer Vittatoe assessed the Defendant and concluded that she was not intoxicated or under the influence of any drugs; she appeared oriented to time and place. According to Officer Vittatoe, he then issued the Defendant her <u>Miranda</u> warnings, and she agreed to speak with them. After the verbal interview was completed, Officer Vittatoe asked the Defendant if she would provide a written statement, and she responded affirmatively. He then had her sign a written waiver of rights form before she gave a very detailed and lengthy written statement, which took her approximately one hour to complete. Officer Vittatoe testified that, during both the verbal and written explanations, the Defendant indicated that she understood her <u>Miranda</u> rights and consented to speak with them. The Defendant initialed each page of her written statement. She also executed a consent to search form, allowing a search of her motel room. Thereafter, the Defendant accompanied Officer Vittatoe to the Loudon County Police Department, where she was further questioned by Det. Newman.

The Defendant's main contention is that she did not knowingly waive her <u>Miranda</u> rights because she was not informed of the purpose and scope of the pending investigation, i.e., she was not told that her husband was in fact deceased and that she was the subject of a murder investigation. We know of no authority, and the Defendant points to none, which supports the requirement to be so informed. Neither the United States Constitution nor the Tennessee Constitution mandates that a criminal suspect be apprised of every possible consequence of a <u>Miranda</u> waiver. <u>See</u> <u>Colorado v. Spring</u>, 479 U.S. 564, 573-77 (1987) (the Court held that the failure of law enforcement officials to inform a suspect of all the possible subjects of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his or her Fifth Amendment privilege); <u>State v. Green</u>, 995 S.W.2d 591 (Tenn. Crim. App. 1998) ("<u>Miranda v. Arizona</u> does not require the interrogating officers to advise a defendant of the nature of the crime under investigation.") (citing <u>State v. Stearns</u>, 620 S.W.2d 92, 95 (Tenn. Crim. App. 1981)). Here, the Defendant was properly given her <u>Miranda</u> warnings, and she voluntarily spoke with officers. Accordingly, the trial court's denial of the motion to suppress is affirmed.

## II. Sufficiency of the Evidence

The Defendant challenges the sufficiency of the evidence supporting her conviction for first degree premeditated murder. She specifically argues that the evidence regarding premeditation was not sufficient to uphold her conviction. The State responds that the evidence regarding premeditation was sufficient for any jury to conclude that the Defendant committed first degree premeditated murder.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of proof is the same, whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

The Defendant was convicted of first degree premeditated murder, which is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1).

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

Tenn. Code Ann. § 39-13-202(d). The presence of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has held that factors demonstrating the existence of premeditation include, but are not limited to, the following: the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; destruction or secretion of evidence of the killing; and calmness immediately after the killing. See State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003); Bland, 958 S.W.2d at 660. Additional factors cited by this court from which a jury may infer

premeditation include lack of provocation by the victim and the defendant's failure to render aid to the victim. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

The Defendant argues that the evidence presented at trial did not establish the existence of premeditation. According to the Defendant,

[t]he linchpin of the State's premeditation case is the texts. However, according to the confession, the texts had been sent and received, and the [Defendant] had been back in the house again with [the victim] before the incident which led to his death. If the confession is credible, the [Defendant] had shown that any present intention to kill [the victim], if any ever existed, had passed before the event which actually led to his death.

We disagree. Just because the Defendant may have gone back inside the house after she sent the text messages does not necessarily negate any evidence of premeditation.

The evidence at trial established that, after a long night of drinking and arguing between the Defendant and the victim, the unarmed victim was shot in the back. The text messages between the couple that evening revealed that the Defendant and the victim were engaged in a heated argument; the Defendant accused the victim of cheating on her and stated that she wished she had a sniper rifle to use on the victim. There was no evidence that the Defendant attempted to aid the victim after firing at him and leaving him to die in the front yard. The medical examiner testified that, if the victim would have received medical treatment in the twenty minutes after he was shot, he likely could have survived his injury. After the murder, the Defendant threw the gun off a bridge, and it was never recovered. The jury chose not to accredit the Defendant's assertion that she was provoked by the victim, as was their prerogative. Accordingly, we conclude that the evidence is sufficient to establish premeditation and to sustain the Defendant's conviction for premeditated first degree murder.

## CONCLUSION

In sum, we conclude that the trial court did not err in denying the Defendant's motion to suppress and that the evidence is sufficient to sustain the Defendant's conviction. Accordingly, we affirm the judgment of the trial court.

_____
D. KELLY THOMAS, JR., JUDGE

-11-